UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HOOSIER ENERGY RURAL ELECTRIC COOPERATIVE, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JOHN HANCOCK LIFE INSURANCE COMPANY; OP MEROM GENERATION I, LLC; MEROM GENERATION I, LLC; AE GLOBAL INVESTMENTS, LLC; AMBAC CREDIT PRODUCTS, LLC; AMBAC ASSURANCE CORPORATION and COBANK, ACB, | ) ) ) ) ) ) ) ) ) | CASE NO. 1:08-cv-1560-DFH-DML |
| Defendants. | ) | |

ENTRY ON HOOSIER ENERGY'S MOTION FOR
PRELIMINARY INJUNCTION

*Introduction*

This case provides a case study of some of the worst aspects of modern finance.  The case arises from an elaborate transaction that combines the sometimes toxic intricacies of credit default swaps and investment derivatives with a blatantly abusive tax shelter.  Investment bankers and lawyers made more than $12 million in fees for putting together the paper transaction known as a "sale in – lease out" or "SILO" transaction of an electrical generating plant.  Although all parties have been making all payments required under the contracts, the

transaction is now in crisis because credit rating agencies have downgraded the credit ratings of one of the parties.

At this stage of the case, plaintiff Hoosier Energy Rural Electric Cooperative, Inc. seeks a preliminary injunction to enjoin defendants (i) John Hancock Life Insurance Company, Merom Generation I, LLC, and OP Merom Generation I, LLC (collectively, "John Hancock"); and (ii) Ambac Assurance Corporation and Ambac Credit Products, LLC (collectively, "Ambac") from making any demand or any payment pursuant to any assertion that a default has occurred and enjoining John Hancock from asserting that a default has occurred.  The court has received and considered the memoranda from both sides, including affidavits and supporting documents.  The court has also heard and considered arguments presented at the hearing on Hoosier Energy's motion held on November 19, 2008. The court now states its findings of fact and conclusions of law pursuant to Rules 52 and 65 of the Federal Rules of Civil Procedure.  As explained below, the court finds that the preliminary injunction should be granted, that further proceedings are needed on the issue of appropriate security for the injunction, and that discovery should proceed immediately.

As with any preliminary injunction matter, the court's findings of fact and conclusions of law are tentative because they are the result of an expedited process.  That is true to an unusual degree in this case.  This case was pending in an Indiana state court, which had granted temporary relief to Hoosier Energy.

The state court's temporary restraining order was set to expire at midnight on November 18, 2008, and the state court had set a hearing on the preliminary injunction for 3:00 p.m. on November 18th.  At approximately 1:30 p.m. on that day, defendants removed the case to this court.  That left only a few hours to address the issue before the state court TRO expired.  The TRO could not be extended further without the consent of the defendants.  The defendants later consented to a brief extension of the terms of the state court TRO until 2:00 p.m. on Friday, November 21st, and on that day agreed to a further extension until midnight tonight, Tuesday November 25th.  Because of the very short time frame that resulted from the timing of the removal, the court emphasizes that these findings and conclusions are tentative and subject to further examination at the request of any party at any time if additional evidence becomes available or further argument would be fruitful.

*Findings of Fact and Conclusions of Law*

I.    *Structure of the Merom SILO Transaction*

Plaintiff Hoosier Energy owns and operates an electrical generating plant in Merom, Indiana on the Wabash River.  In 2002, Hoosier Energy and the other parties entered into a complex transaction known as a "sale in – lease out" or "SILO" in which Hoosier Energy leased certain assets at its Merom power plant to John Hancock for a term of 63 years (longer than its useful life) and then leased the same assets back for a term of 30 years.  At the risk of oversimplifying a

complex transaction, the court will try to summarize.  John Hancock made an immediate one-time payment of $300 million for its 63 year lease.  John Hancock then immediately leased these assets back to Hoosier Energy.  Hoosier Energy kept about $20 million, and approximately $278 million was deposited with various Ambac entities, which in turn were required to make lease payments on Hoosier Energy's behalf to John Hancock.  Hoosier Energy made payments into other funds controlled by Ambac with an eye toward the back end of the deal, when it would be virtually certain that Hoosier Energy would remain in control of the Merom plant.

The transaction was promoted and designed by lawyers and investment bankers (transaction costs were more than $12 million) with the hope that it would allow John Hancock to claim to be the "owner" of the Merom plant for tax purposes and thus enable it to claim tens of millions of dollars of tax deductions. Those deductions were of no use to Hoosier Energy as the plant owner because it simply does not earn significant profits.  It is a cooperative made up of members that are rural electric cooperatives.

As part of the complex transaction (documented in approximately 4000 pages of fine print), Hoosier Energy was required to obtain a "credit default swap" from Ambac to give John Hancock further assurance that it would actually receive the promised lease payments.  Bernardi Aff. ¶ 12; Knowlton ¶ 19.  In general terms, the parties agreed that if Hoosier Energy defaulted on its obligations under

the contracts, John Hancock could demand a "termination payment" from Ambac, and Ambac could turn to Hoosier Energy for payment under a closely parallel credit default swap contract between Ambac and Hoosier Energy.  Ambac also provided a surety bond for the benefit of John Hancock.

As part of the terms of this credit protection for John Hancock, the parties agreed that if Ambac's credit rating dropped below a specific threshold, Hoosier Energy would have sixty days to find a new qualified swap provider.  Bernardi Aff. ¶ 12.  Hoosier Energy's failure to secure a new qualified swap provider would allow John Hancock to declare a default under the contracts, to terminate the entire transaction, and to demand an early termination payment from Ambac.  In that event, Ambac would be able to demand very substantial payments from Hoosier Energy.  The parties agreed to a schedule for the termination payment, depending on the date of the payment.  The schedule was designed to give John Hancock, in the event of termination, the "Net Economic Return" it hoped to receive from the entire transaction, based on the assumption that it would be entitled to all of the hoped-for tax benefits.  *Id.*, ¶¶ 13-14; see also Pl. Ex. 5 at 52-53 ("Termination Value" is "an amount intended to maintain the Net Economic Return of the Owner Participant [John Hancock] through the date in question"); *id.* at 28 (defining "Net Economic Return" to include John Hancock's after-tax returns).

Because of the significant tax risk associated with the Merom SILO transaction, the deal's documents included a Tax Indemnity Agreement.  Hoosier

Energy insisted, and John Hancock agreed, that Hoosier Energy would not have liability for indemnification for loss resulting from, among other things, "a determination that the transactions contemplated by the Operative Documents are a sham, lack a valid business purpose or have a substance that is different from their form . . . ."  Pl. Ex. 6 (Tax Indemnity Agmt.) § 6(s) at 20.

II.      *Rulings from the IRS and Subsequent Credit Crisis*

Around the time these parties closed the Merom SILO transaction in 2002, the IRS began disallowing claimed income tax deductions from taxpayers who had participated in other SILOs.  See Pl. Ex. 29 (IRS Notice 2005-13 regarding SILO transactions).  Courts have decided in favor of the IRS on transactions structured similarly to the Merom SILO transaction among these parties.  See, *e.g.*, *BB&T Corp. v. United States*, 523 F.3d 461, 477 (4th Cir. 2008) ("LILO" or lease in–lease out); *AWG Leasing Trust v. United States*, 2008 WL 2230744, at *35 (N.D. Ohio May 28, 2008) (SILO).  The IRS has gone so far as to offer earlier this year a form of tax amnesty for parties to similar SILO and LILO transactions, which the IRS deems abusive tax shelters.  See Pl. Exs. 30-32.  The IRS has announced that taxpayers involved in more than 80 percent of the SILO and LILO transactions have accepted the offer.  Pl. Ex. 33.  John Hancock apparently has chosen not to take advantage of this offer, at least with respect to the Merom SILO transaction.[1]

---

[1]Parallel to the Merom SILO transaction between John Hancock and Hoosier Energy, Hoosier Energy entered into a similar SILO deal with Bank of America for a smaller portion of the Merom assets.  Bank of America apparently has decided
(continued...)

At the time these parties entered into the Merom SILO transaction, they received opinions from several law firms to the effect that the transaction would produce legally valid and enforceable rights and obligations according to the terms of the agreements.  Compl. Exs. 54-56, 58-60.  The parties have not directed the court's attention to any opinion by counsel, even in 2002, to the effect that the transaction would be treated properly as a genuine sale and lease-back for federal income tax purposes so that John Hancock could be deemed a genuine owner of the Merom assets and thus entitled to the claimed tax benefits.

Hoosier Energy has filed an affidavit from Stanford Law School's Professor Alan Joseph Bankman, who is an expert in tax shelters.  Professor Bankman has examined the Merom SILO transaction and has concluded:   "The Merom Transaction was at its inception in 2002, and continues to be, an abusive tax shelter  .  .  .  .   The IRS will certainly deny the tax benefits that Hancock is claiming."  Bankman Aff. ¶ 8.  In the limited time the court has had to examine the issue, the court concludes that Professor Bankman is probably correct.  The complex flow of funds in the transaction has little or no economic substance and appears not to grant John Hancock the sorts of rights, risks, and responsibilities sufficient for it to be treated as an owner of the Merom generating facility.   It appears highly likely that the intended tax benefits will not be allowed.  The entire

---

[1](…continued)
to take advantage of the IRS amnesty program.

Merom SILO transaction appears to have been an abusive tax shelter, a sham with little or no economic substance.

Notwithstanding the tax problems, the IRS apparently has not yet examined the Merom deal or challenged John Hancock's claimed tax deductions that appear to have been in the tens of millions of dollars so far.  All parties to the transaction have made all payments required under the contracts, and John Hancock has received on time every penny it has been owed.

In June 2008, however, Ambac's published credit rating fell below the level specified in the contract documents.  Hoosier Energy was notified of this change, recognized that the contract required it to find a new participant with comparably strong credit ratings, and began looking.  It encountered extraordinary difficulty in doing so.  Based on the limited information before the court, this year's credit "tsunami" appears to have been the primary reason that Ambac's credit rating fell. The credit crisis also appears to have made it impossible – or nearly impossible – for Hoosier Energy to find a substitute for Ambac with a sufficient rating, on time, and at any price.

"Nearly" impossible?  The qualifier is important.  In December 2007, nine of the thirteen financial guarantors tracked by Moody's and Standard & Poor had ratings that satisfied the criteria of the Merom SILO agreements.  Dudney Aff. ¶ 23-24.  In the summer and fall of 2008, credit markets experienced unparalleled

adverse events.  By June 2008, only three of those thirteen guarantors had the requisite ratings.  *Id.*  The crisis was not anticipated by the most senior economists in the country.  For example, former Federal Reserve Chairman Alan Greenspan testified before a Congressional committee on October 23, 2008:

> We are in the midst of a once-in-a-century credit tsunami.  Central banks and governments are being required to take unprecedented measures . . . .  This crisis . . . has turned out to be much broader than anything I could have imagined.  It has morphed from one gripped by liquidity constraints to one in which fears of insolvency are now paramount . . . .  Those of us who have looked to the self-interest of lending institutions to protect shareholder's equity (myself especially) are in a state of shocked disbelief.

Dudney Aff. ¶ 21.

On June 19, 2008, Moody's downgraded Ambac to a rating of Aa3, which gave Hoosier Energy sixty days to replace Ambac in the credit default swap arrangements.  Bernardi Aff. ¶ 18; Knowlton Aff. ¶ 25.  Hoosier Energy immediately began trying to replace Ambac with a credit enhancement vehicle that would meet the credit conditions of the Merom SILO agreements.  Bernardi Aff. ¶ 18.  Those efforts are documented in considerable detail in the record.

Hoosier Energy informed John Hancock of these efforts by letter on June 20, 2008 but warned that it could take more than sixty days to secure a replacement because of the extraordinary state of the credit markets.  Bernardi Aff. ¶ 19; Knowlton Aff. ¶ 26.  Hoosier Energy also proposed potential solutions to the situation, including allowing Hoosier Energy more than the sixty days

contemplated in the Agreement to secure a replacement, granting waiver of the Aa2 credit rating requirement, restructuring the transaction without credit enhancement requirements, and unwinding the transaction altogether.  Bernardi Aff. ¶ 19.  Hoosier Energy, John Hancock, Ambac, and CoBank conferred on July 10th, and John Hancock appeared to support Hoosier Energy's efforts in the face of the credit crisis.  Bernardi Aff. ¶ 21; Knowlton Aff. ¶ 28.  However, on July 21st, John Hancock rejected the proposals Hoosier Energy outlined in its June 20th letter, including permitting Hoosier Energy additional time to find a replacement for Ambac.  Bernardi Aff. ¶ 22.

Hoosier Energy's efforts continued, and by August 6th it had made progress in negotiating with Bank of America and CoBank for letters of credit in amounts equal to the equity portion of the termination value.  Hoosier Energy informed John Hancock of this development.  John Hancock responded positively, stating that it would accept the proposed letters of credit but that it preferred to have Bank of America support the entire amount.  Bernardi Aff. ¶ 24; Knowlton Aff. ¶ 29. John Hancock also stated that it would extend the replacement period until September 2nd, contingent on production of either signed term sheets or letters of intent from Bank of America and CoBank.  Bernardi Aff. ¶ 24; Knowlton Aff. ¶ 29.  However, Bank of America decided not to proceed with the credit enhancement for the Merom SILO transaction.  Bernardi Aff. ¶ 26.

Hoosier Energy continued to seek a replacement for Ambac.  On September 3rd, Hoosier Energy and John Hancock executed an agreement extending the replacement period another thirty days.  Bernardi Aff. ¶ 27; Knowlton  Aff. ¶ 30. On September 8th, Hoosier Energy received a proposal from Berkshire Hathaway that outlined alternative methods of providing credit replacement for Ambac. Bernardi Aff. ¶ 28.  Negotiations began, and Hoosier Energy kept John Hancock apprised of its progress and the likelihood that it would need another extension of time to finalize the deal with Berkshire Hathaway.  Bernardi  Aff. ¶ 29.

On September 29th, John Hancock received a Summary of Terms and Conditions under which Berkshire Hathaway would issue a Lease Equity Surety Bond.  Bernardi Aff. ¶ 30; Pl. Ex. 16.  The term sheet expressly contemplated a 90-day period between signing and closing, a provision required by Berkshire Hathaway.  Bernardi Aff. ¶ 30; Pl. Ex. 16 at 5.  Hoosier Energy forwarded the term sheet to John Hancock and said that while it had found a suitable replacement for Ambac, it would need more time to close the deal.  Bernardi Aff. ¶ 30.

On October 3rd, John Hancock agreed to extend the replacement period, but only by twenty days.  Bernardi Aff. ¶¶ 34-36; Knowlton Aff. ¶ 31.  Hoosier Energy attempted to accelerate the finalization of the Berkshire Hathaway deal. On October 13th, its board of directors voted to approve the term sheet, and the Berkshire Hathaway term sheet was executed.  Hoosier Energy forwarded a copy of the executed term sheet to John Hancock.  Bernardi Aff. ¶ 39; Knowlton Aff.

¶ 32-33.  The replacement period was due to expire on October 22nd, and Hoosier Energy sent a draft Third Waiver Extension Agreement to John Hancock that would extend the replacement period by another 90 days.  John Hancock did not respond.  Bernardi Aff. ¶¶ 40-44.  Also on October 22nd, Hoosier Energy was reassured that although Berkshire Hathaway senior management needed to approve the deal, Berkshire intended to close the deal.  Pl. Ex. 24.  Hoosier Energy informed John Hancock of Berkshire's intent.  *Id.*

On October 23rd, however, the same day that Mr. Greenspan testified about the "credit tsunami," John Hancock pulled the plug on Hoosier Energy's effort to replace Ambac.  John Hancock rejected Hoosier Energy's request for an additional extension and informed Hoosier Energy that an "Event of Default" had occurred under the contract.  Bernardi Aff. ¶ 46; Knowlton Aff. ¶¶ 34-35.  John Hancock advised Ambac that it would expect its termination payment of approximately $120 million on October 31, 2008.  Such a payment would immediately trigger a duty on the part of Hoosier Energy to pay Ambac either the same sum of approximately $120 million immediately, or at least $26 million immediately, followed by installment payments over four years for total payments of approximately $160 million.  Ambac has stated that it was and is ready, willing and able to make the $120 million termination payment to John Hancock unless it is enjoined from doing so.

III.    *Procedural History*

Hoosier Energy filed this action in the Monroe Circuit Court on October 30, 2008 and obtained an *ex parte* temporary restraining order  precluding any of the John Hancock or Ambac parties from making any payments pursuant to John Hancock's notification that Hoosier Energy was in default and the related notification that a "Credit Event" had occurred.

On November 5, 2008, Hoosier Energy moved for a ten-day extension of the TRO.  The motion was unopposed, and the Monroe Circuit Court granted the motion and set the matter for a preliminary hearing on November 18, 2008. Although John Hancock did not oppose Hoosier Energy's motion for an extension, it filed a motion to require Hoosier Energy to post a $120 million bond as security for the injunctive relief.  The Monroe Circuit Court held a hearing on the bond request on November 12, 2008.  After considering arguments from counsel, relevant contract terms, and the affidavit of Hoosier Energy's Thomas Bernardi, the Monroe Circuit Court concluded that a $100,000 bond, coupled with John Hancock's subordinated mortgage and security interest in the Merom plant, provided John Hancock with sufficient security required by Indiana Trial Rule 65(C), which parallels Rule 65(c) of the Federal Rules of Civil Procedure.  Hoosier Energy has complied with the state court's bond order.

Less than two hours before the Monroe Circuit Court was to hear Hoosier Energy's motion for preliminary injunction, and less than twelve hours before the

TRO would expire, John Hancock removed this case to federal court.  Hoosier Energy immediately submitted to this court its papers in support of its preliminary injunction request.  The court held a conference on the record with counsel for all parties on the afternoon of November 18th, then a hearing on the motion for preliminary injunction on the afternoon of November 19th, and then a conference on the morning of November 21st.

IV.     *Preliminary Injunction Requirements*

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. —, 129 S. Ct. —, slip op. at 10 (2008).

A.     *Irreparable Harm*

Hoosier Energy will likely suffer immediate and severe irreparable harm if preliminary injunctive relief is not granted.  The record shows with sufficient clarity that if Ambac makes the $120 million termination payment to John Hancock tonight or tomorrow, Ambac will immediately be entitled to a payment of either the same $120 million from Hoosier Energy or at least $26 million (perhaps $40 million) immediately, followed by installment payments of approximately $40 million per year over the next four years.  Hoosier Energy has

been covering its operating expenses and debt service, but it would be impossible for Hoosier Energy to pay the termination payment either as a lump sum or in installments. The demand alone would make it impossible for Hoosier Energy to obtain any further credit to continue in business. In addition, Hoosier Energy would cross-default on hundreds of millions of dollars of other loans, lines of credit, and long-term supply contracts.

It is highly likely that Hoosier Energy would be forced to file very quickly for protection under Chapter 11 of the Bankruptcy Code. Where other requirements are also met, immediate exposure to bankruptcy "sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (affirming preliminary injunction); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (damages remedy would be inadequate and irreparable harm would result if the damage award "come[s] too late to save the plaintiff's business").

The court is not persuaded by John Hancock's argument that these harms are merely speculative or just "economic ripples" that the court should disregard. If the terms of the Merom SILO contracts are enforced as written, these consequences for Hoosier Energy will be imminent, direct, and foreseeable.

B.    *Likelihood of Success on the Merits*

Hoosier Energy has shown a reasonable likelihood of success on the merits on two independent theories for relief: the essential illegality of the Merom SILO transaction, and temporary commercial impracticability. All of the contracts provide that New York substantive law governs them, though Indiana law might apply to whether the forum state's public policy has been violated by the contracts. See generally *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 812-14 (S.D. Ind. 2007) (applying Indiana public policy despite contractual choice to apply Maine law).

1.     *Illegality of the Entire Merom SILO Transaction*

Hoosier Energy asserts that the entire Merom SILO Transaction is illegal and void as against public policy because it is no more than a paper transaction with no economic substance other than as an abusive tax shelter similar to that found unlawful in *AWG Leasing Trust v. United States*, 2008 WL 2230744 (N.D. Ohio May 28, 2008).  Professor Bankman's affidavit has detailed the similarities between the AWG tax shelter and the Merom SILO transaction at issue here. Defendants have not offered contrary evidence on this point.  (Defense expert Dr. David Ellis, Ph. D., observed that the Merom SILO transaction is similar to other leveraged lease transactions with which he is familiar, but he did not express any opinions about the economic substance of the transaction or the viability of the tax strategy.)   At this preliminary stage of the case, the court finds Professor Bankman's opinions persuasive on this issue.  This deal was an attempt to create an appearance of a sale but without any real economic substance.  Hoosier Energy retained essentially all of the benefits and burdens of ownership of the Merom plant.  John Hancock did not take on sufficient benefits and burdens of ownership to be treated as an owner for federal tax purposes.  Despite the reams of paper and the circular flows of hundreds of millions of dollars, the transaction appears to have been a sham, without economic substance.

The court is not persuaded by John Hancock's efforts to separate the legality of the John Hancock–Ambac credit default swap agreement (Compl. Ex.

29) from the rest of the entire Merom SILO transaction.  All of the agreements that make up the entire transaction were conditioned upon the execution of all the other agreements.  Without fitting every piece of the puzzle together, there would have been no transaction.[2]

The court also is not persuaded by John Hancock's attempt to separate the tax aspects of the transaction from its overall legitimacy.  At the hearing, counsel for John Hancock pointed out that if he purchased a house and then improperly took tax deductions for interest on the house (because it was not his primary residence, for example), the government's later disallowance of his claimed tax deductions would not affect the legality or validity of the original sale of the property.  True enough, but the hypothetical assumes that the buyer would actually have taken on the benefits and burdens of ownership, that there was some economic substance to the transaction.  The Merom SILO transaction is not comparable.  It appears to have been a pure, abusive tax shelter, with no economic substance to the transaction at all, despite the elaborate and expensive

_____

[2]John Hancock also argues that Hoosier Energy has no right even to make this argument because John Hancock is free to pursue relief only from Ambac under Complaint Exhibit 29, the Internal Swaps and Derivative Associations agreement between John Hancock and Ambac.  John Hancock cites cases holding that a party may seek relief from a guarantor or surety or on a letter of credit without seeking relief from the principal obligor.  As Ambac has pointed out, however, the John Hancock – Ambac agreement is not a surety, guaranty, or letter of credit.  It is a credit default swap, and the applicability of the principles from other contexts is not at all clear here.  See Compl. Ex. 62 (opinion of bankruptcy counsel drawing these distinctions).  Most important, the John Hancock – Ambac deal was part of an integrated whole that appears to have been abusive and illegal at its core.

window dressing.  This deal was the attempted sale of tax deductions and no more than that; it appears to have been rotten to the core, so that the illegality affects every portion of the deal.

John Hancock points out that an agency of the federal government approved the transaction and argues that the transaction thus could not possibly be contrary to law or public policy.  The agency that approved the transaction was the Rural Utility Service.  See Compl. Exs. 11, 12.  There is no indication on this record that the agency considered the tax motivations for the transaction.  See Compl. Ex. 60 (opinion of counsel for RUS that the RUS obligations were valid and binding).  Similarly, the record includes opinions from several law firms to the effect that the contracts are valid and binding, Compl. Exs. 54-56, 58-60, but the parties have not directed the court to opinion letters that directly address the tax issues that are at the heart of the economics of the entire transaction.

John Hancock points to the severability clause in the Participation Agreement: "If any provision hereof shall be invalid, illegal or unenforceable under Applicable Law in an jurisdiction, the validity, legality and enforceability of such provision in any other jurisdiction and of the remaining provisions hereof in any jurisdiction shall not be affected or impaired thereby."  Compl. Ex. 1, § 16.10, at 85.  Such severability clauses can serve many useful purposes when parties enter into contracts under conditions of legal uncertainty.  In this case, however, the Merom SILO transaction appears to have been thoroughly abusive and fraudulent

at its core.  The court therefore does not see any reason to honor the parties' effort to parse out the consequences of the tax abuse.  See *Frederick v. Frederick*, 358 N.E.2d 398, 402 (Ill. App. 1976) (holding that prenuptial agreement intended to defraud government of taxes was unenforceable in its entirety:  "Where the consideration for an agreement is entire and inseparable and a part of the consideration is illegal, the whole agreement is unenforceable.").

John Hancock also points out that Hoosier Energy agreed not to challenge the tax status of the transaction or John Hancock's efforts to secure the tax benefits it hoped to gain.  See John Hancock Br. 13-14, citing Compl. Ex. 37 (Tax Indemnity Agmt.) § 3(b), at 9.  John Hancock argues that Hoosier Energy breached the contract by arguing to the court that the transaction itself is illegal.  The court assumes that such provisions may be valid to the extent that parties agree to report a transaction consistently for tax purposes.  But at least when it comes to a transaction that is as abusive as this one seems to have been, and when it comes to public obligations like federal taxes, this kind of private "oath of silence" cannot be a valid and enforceable term of the contract.  It is void as against public policy.  (John Hancock's suggestion that the court should strike the relevant portions of the Complaint, see John Hancock Br. 14 n.8, is hereby overruled.)  It is worth recalling that all the parties to this abusive transaction assumed that the public courts of the United States and its constituent states would be available to them to protect and enforce their rights.  Those public courts have no business honoring an effort to defraud the taxpayers who support those courts.

Assuming Hoosier Energy can prevail ultimately on this theory of illegality, what consequences should flow from a conclusion that the transaction is contrary to public policy and void?  The long term consequences would probably involve some form of unwinding or rescission of the transaction, using a court's equitable powers, and it is unlikely that a court would allow Hoosier Energy to keep the $20 million or so that it received from John Hancock at the front end of the transaction.

The general rule under New York law is that "no right of action can spring out of an illegal contract."  *Parpal Restaurant, Inc. v. Robert Martin Co.*, 685 N.Y.S.2d 481, 481 (N.Y. App. Div. 1999) (sublease was created for improper tax avoidance, precluding any right of action arising from the unlawful undertaking), citing *Carmine v. Murphy*, 285 N.Y. 413, 416, 35 N.E.2d 19, 21 (1941) (breach of contract for unlicensed sale of alcoholic beverages held not enforceable), and *Scotto v. Mei*, 642 N.Y.S.2d 863, 865 (N.Y. App. Div. 1996) (reversing preliminary injunction ordering specific performance of contract of employment that was prohibited by state law).

Courts in a number of states have applied these principles to contracts intended to evade taxes unlawfully.  *E.g.*, *Sabia v. Mattituck Inlet Marina and Shipyard, Inc.*, 805 N.Y.S.2d 346, 347 (N.Y. App. Div. 2005) (holding unenforceable a contract for sale of boat that was falsely documented to avoid sales tax); *Homami v. Iranzadi*, 260 Cal. Rptr. 6, 9-12 (Cal. App. 1989) (collecting cases and

holding that holder of promissory note intended to avoid reporting of interest income for income tax purposes was not entitled to enforce note); *Frederick*, 358 N.E.2d at 401 (holding prenuptial agreement unenforceable: "A contract, the purpose of which is to defraud the U.S. government out of tax money, is an illegal and unenforceable contract."). This general rule appears to be the case even if the parties swear in blood that their obligations are "irrevocable, absolute and unconditional," or even "irrespective of the . . . legality" of any other portions of the transaction. See Compl. Ex. 29, § 5(b), at 52.

It may be that this theory of illegality should lead the court simply to deny relief to Hoosier Energy. After all, if no party is entitled to enforce the tainted contracts, why should a court step in and grant injunctive or declaratory relief to Hoosier Energy, which was itself a party to the transaction? That denial would leave Ambac free, if it were in fact willing to do so, to make a termination payment of $120 million to John Hancock, and then to take its own chances on whether it could recover any of the $120 million from Hoosier Energy. That course would probably maximize the prospects for an unjust result in the case, though the court assumes that Ambac might be reluctant to make the payment under those circumstances. Hoosier Energy has suggested, and the court believes, that the court may have the equitable power instead to "unwind" the illegal transaction (as the IRS is requiring in similar deals under the amnesty program) in a way that tries to minimize windfalls and unfair burdens for particular parties. Because of the public interest at stake, addressed below, an injunction that prevents

irreparable harm and preserves the status quo while these difficult issues are explored further seems to be the more prudent and equitable course – one that also allows for the possibility that the court's conclusions may not be correct.

In reaching this tentative conclusion, the court is fully mindful of the long-honored principle that parties are free to order their affairs with an eye toward the tax consequences and to minimize the taxes they might legally owe.  See *Superior Oil Co. v. Mississippi*, 280 U.S. 390, 395-96 (1930); *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) (Hand, J.), *aff'd*, 293 U.S. 465 (1935); accord, *Estate of Stranahan v. Commissioner*, 472 F.2d 867, 869 (6th Cir. 1973) (allowing challenged tax treatment where both form and substance of assignment transaction supported that result).   That principle does not apply to the Merom SILO transaction, at least based on the record before this court at this point.  For the reasons stated, the transaction appears to have had one motivating force:  abusive and fraudulent use of tax deductions by a party who had no significant benefits or burdens of ownership of the property in question.  The volume of paper used to dress up this central purpose does not affect its core illegality.[3]

---

[3]In *Helvering v. Gregory*, Judge Hand famously wrote that "a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation.  Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."  69 F.2d at 810.  In that case, however, the court actually ruled in favor of the government based on reasoning that parallels the relevant point in this case:   "But the underlying presupposition is plain that the readjustment [the disputed transaction] shall be undertaken for reasons germane to the conduct of the venture in hand, not as an ephemeral
(continued...)

2.   *Temporary Commercial Impracticability*

Even if the court is wrong about the essential illegality of the Merom SILO transaction, Hoosier Energy would also have a reasonable likelihood of succeeding on the merits on its theory of temporary commercial impracticability.   Hoosier Energy does not argue that the credit crisis should forever excuse its obligation to replace Ambac as a credit swap partner.   Hoosier Energy argues that, given the extraordinary but temporary circumstances presented by the credit crisis, it was entitled to a reasonable period of additional time to replace Ambac under the doctrine of temporary commercial impracticability.

While he still sat on the district court, Judge Smith of the Third Circuit addressed a similar defense and laid out some of the basic principles:  "In the overwhelming majority of circumstances, contractual promises are to be performed, not avoided:  *pacta sunt servanda*, or, as the Seventh Circuit loosely translated it, 'a deal's a deal.'"   *Specialty Tires of America, Inc. v. CIT Group/Equipment Financing, Inc.*, 82 F. Supp. 2d 434, 437 (W.D. Pa. 2000), quoting *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1010 (7th Cir. 1996), citing John D. Calamari & Joseph M. Perillo, The Law of Contracts § 13.1, at 495 (4th ed. 1998).   Judge Smith continued:  "Even so, courts have recognized, in an evolving line of cases from the common law down to the present,

---

[3](...continued)
incident, egregious to its prosecution.  To dodge the shareholders' taxes is not one of the transactions contemplated as corporate 'reorganizations.'"  *Id.* at 811.

that there are limited instances in which unexpectedly and radically changed conditions render the judicial enforcement of certain promises of little or no utility. This has come to be known, for our purposes, as the doctrines of impossibility and impracticability." *Specialty Tires*, 82 F. Supp. 2d at 437. Given the importance of the principle that courts respect and enforce parties' valid and lawful contracts, these are doctrines that must be employed with great caution, but they retain a place in the law under sufficiently extreme circumstances.

To assert the affirmative defense of commercial impracticability, "the party must show that the unforeseen event upon which excuse is predicated is due to factors beyond the party's control." *Cliffstar Corp. v. Riverbend Prod., Inc.*, 750 F. Supp. 81, 85 (W.D.N.Y. 1990), quoting *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 149-50 (6th Cir. 1988). Temporary commercial impracticability excuses performance until circumstances have changed, plus a reasonable time afterwards:

> Impracticability of performance or frustration of purpose that is only temporary suspends the obligor's duty to perform for the duration of the impracticability or frustration; it does not discharge the ultimate duty or prevent it from arising. Thus, temporary impracticability only relieves the promisor of an obligation to perform for as long as the impracticability lasts plus a reasonable time afterwards.

30 Williston on Contracts § 77:103 (4th ed. 2008); see also Restatement (Second) of Contracts § 269 (1981); *Specialty Tires of America*, 82 F. Supp. 2d at 442 (applying doctrine to excuse performance temporarily); *Long Signature Homes,*

*Inc. v. Fairfield Woods, Inc.*, 445 S.E.2d 489, 491 (Va. 1994).  New York law recognizes the doctrine of temporary commercial impracticability.  See *Bank of Boston Int'l of Miami v. Arguello Tefel*, 644 F. Supp. 1423, 1427 (E.D.N.Y. 1986) (recognizing doctrine but holding it did not apply after the obstacle to performance had been removed); *Bush v. Protravel Int'l, Inc.*, 746 N.Y.S.2d 790, 797-98 (Civ. Ct. 2002) (applying doctrine based on interruptions in communication following September 11, 2001 terrorist attacks in New York).[4]

John Hancock counters that an economic crisis cannot support a defense of impracticability, and that if that argument prevailed, "every debtor in a country suffering economic distress could avoid its debts."  John Hancock Br. 24, quoting *Bank of New York v. Tri Polyta Finance B.V.*, 2003 WL 1960587 (S.D.N.Y. Apr. 25, 2003) (Asian economic collapse did not excuse defendants' default on basis of impossibility of performance).  John Hancock also relies heavily on *Kel Kim Corp. v. Central Markets, Inc.*, 519 N.E.2d 295 (N.Y. 1987), in which the court refused to excuse a tenant's failure to provide liability insurance when, due to a liability insurance crisis, the tenant was unable to secure the level of insurance required by the lease.  The court found that the tenant's "inability to procure and maintain requisite coverage could have been foreseen and guarded against when it specifically undertook that obligation in the lease. . . ."  *Id.* at 296.  John Hancock argues that it was not actually impossible for Hoosier Energy to find a

---

[4]Judge Smith's opinion in *Specialty Tires* provides a detailed and thoughtful discussion of the doctrine, including its dangers and limits, that goes well beyond what this court has had time to provide.  See 82 F. Supp. 2d at 437-42.

replacement for Ambac, and that in any event, Hoosier Energy should have foreseen and guarded against its inability to find a replacement.  Hancock Br. 25.

If the nature and scope of the credit crisis were more limited or a mere economic downturn, John Hancock's argument that the crisis was foreseeable or that Hoosier Energy should have protected itself better might be more persuasive.  However, the credit crisis facing the world's economies in recent months is unprecedented and was not foretold by the world's preeminent economic experts.  The crisis certainly was not anticipated in 2002, when the deal between Hoosier Energy, Ambac, and John Hancock was being finalized.  Retrospect will not assist John Hancock here, nor will an assertion that it was Hoosier Energy's responsibility to prepare for and guard against any imaginable commercial calamity.  After all, "foreseeable" is different from "conceivable."  *Specialty Tires*, 82 F. Supp. 2d at 439, quoting John E. Murray, Jr., Murray on Contracts § 112 at 641 (3d ed. 1990) ("If 'foreseeable' is equated with 'conceivable', nothing is unforeseeable.").  Hoosier Energy has come forward with evidence indicating that the obstacles it faced were not specific to Ambac but were the product of the credit crisis that effectively but temporarily froze the market for comparable credit products *at any price*.  Those effects were not anticipated and could not have been guarded against.[5]

---

[5]John Hancock points out that Hoosier Energy had been reluctant to accept terms offered by Berkshire Hathaway because the deal would have been, in Bernardi's words, "prohibitively expensive."  Bernardi Aff. ¶ 38.  Expensive does not mean impossible or impracticable.  But the evidence shows that on October
(continued...)

Unlike the defendants in the *Bank of New York* or *Kel Kim* cases, Hoosier Energy does not ask John Hancock to excuse its performance for an uncertain or unlimited period of time.  In the midst of unprecedented economic tumult, Hoosier Energy had made significant headway in securing Ambac's replacement, even at what Hoosier Energy has described as a prohibitive price.  But even after credit markets began to thaw, Hoosier Energy needed an additional ninety days to finalize the $120 million deal with Berkshire Hathaway, a deal that was already on the table.  John Hancock points out that Hoosier Energy, by contract and with agreed extensions, had already had more than 120 days to replace Ambac.  John Hancock contends that it was not obligated to grant Hoosier Energy unlimited extensions.  Unlimited extensions, no.  But reasonable extensions, in a time of economic crisis and under the doctrine of temporary commercial impracticability, yes.  The Berkshire Hathaway deal, before John Hancock turned out the lights, was not theoretical or speculative.  The preliminary terms had been executed and Berkshire Hathaway had indicated its intent to proceed.  Under any circumstances, ninety days does not seem an unreasonable amount of time to finalize a complicated $120 million deal.  Given the state of economic affairs on October 23rd, when John Hancock refused the extension, ninety days appears to have been a reasonable request.   Hoosier Energy has shown a reasonable

---

[5](...continued)
13th, Hoosier Energy signed the term sheet for those "prohibitively expensive" terms, forwarded that information to John Hancock, and asked for time to close the deal.  Thus, Hoosier Energy's temporary commercial impracticability argument seems to depend on the logistics of closing another complex deal, not on the expense of that deal.

likelihood of success on the merits on its defense of temporary commercial impracticability.

C.      *Balance of Equities*

The balance of equities favors Hoosier Energy.  In applying this factor, the Seventh Circuit has often instructed district courts to try to minimize the risk of error, whether the error would be in granting or denying injunctive relief.  *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002);  *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 n.12 (7th Cir. 1992); *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir. 1985); accord, *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387-88 (7th Cir. 1984).  If the court erroneously denies injunctive relief, Hoosier Energy will be forced into bankruptcy and into default on a host of other loans and supply contracts.  The disruption of its business could not be remedied by a later award of money damages.

If the court erroneously grants injunctive relief, John Hancock will not receive immediately the termination payment to which the contractual documents entitle it.  Instead, John Hancock would receive that payment later, presumably with interest.  John Hancock argues that it faces serious credit risks, in that Ambac or Hoosier Energy or both could default on their obligations.   John Hancock points to recent further downgrades in Ambac's credit rating, though it

remains "investment" grade.   John Hancock also points to Hoosier Energy's evidence about its inability to cover the termination payment (on the Ambac–Hoosier Energy side of the credit default swap).   Along these lines, it is worth repeating that Hoosier Energy has made every lease payment it was required to make, and the various Ambac entities have made all required payments to John Hancock and to the other entities entitled to payments under the Merom transaction.   Also, Hoosier Energy, as a cooperative of retail REMCs, has a reliable cash flow to cover all of its current obligations for the foreseeable future.   See Bernardi Aff. ¶ 52.   It is only the prospect of the extraordinary termination payments in the Merom SILO transaction that puts Hoosier Energy's future in doubt.   *Id.*, ¶¶ 53-56.

John Hancock points out correctly that if the court erroneously grants injunctive relief, it will be exposed to credit risks greater than those it agreed to accept.   That exposure reflects potential harm to John Hancock, but that *potential* harm pales next to the virtual certainty of the serious irreparable harm that an erroneous denial of injunctive relief would inflict on Hoosier Energy and its constituent REMCs.   In addition, even in the unlikely scenario in which Ambac is unable to satisfy its obligations, John Hancock has an over-collaterized mortgage and security interest in the Merom plant.   That security is less liquid than the credit default swap with Ambac, but it nevertheless provides substantial security.

The character of the Merom SILO transaction as an abusive tax shelter also factors into the court's weighing of the equities.  John Hancock understandably points out that Hoosier Energy happily entered into the transaction and received some $20 million in cash at the front end, and has not complained about the tax aspects of the transaction until now.  John Hancock argues that the court should not interfere with Ambac's payment on its credit default swap with John Hancock and should defer consideration of Hoosier Energy's defenses to a later lawsuit between Ambac and Hoosier Energy.  That approach would probably result in a great inequity if Hoosier Energy's challenge to the legality of the transaction is sound.  John Hancock would walk away with the economic equivalent of the tax windfall it hoped to gain.  Ambac would be left unable to collect from Hoosier Energy on the theory that the obligations of this entire transactions are void and that the courts should leave the parties where they find themselves.  Yet John Hancock is the party who, in effect, tried to buy tax deductions it was not entitled to and who knowingly accepted the risk that the transaction might be deemed a sham and an abusive tax shelter.  See Compl. Ex. 37 (Tax Indemnity Agreement) § 6(s), at 20.

The court has considered whether it should simply deny all relief on a theory of "unclean hands."  After all, Hoosier Energy was itself a party to the transaction it claims is a sham.  If the court reaches a final decision that the transaction was a sham, the court will face some challenging problems in crafting any appropriate remedies.  But the court is satisfied that doing nothing now would

almost surely produce an inequitable effect by letting John Hancock walk away with the windfall of  fraudulent tax benefits.  If the court is wrong about the illegality of the transaction but right about temporary commercial impracticability, a denial of all relief would still risk the irreparable harm described above.  The more prudent, risk-minimizing course at this point is to grant injunctive relief to prevent irreparable harm and to sort out later the difficult terms of final equitable relief (such as addressing Hoosier Energy's $20 million in up-front benefits from the transaction).

D.  *Public Interest*

A preliminary injunction to preserve the status quo will serve the public interest.  The public interest is served by John Hancock not receiving a windfall in these circumstances.  The public interest also is served by Hoosier Energy continuing to deliver power to its member cooperatives, which in turn provide power to Indiana homes, farms, businesses and industries.  If Hoosier Energy's ability to do so is imperiled, so may be its ability to fulfill its mission to the public.  When denial of preliminary relief threatens irreparable harm to the plaintiff and to the public, the equities weigh heavily in favor of granting that relief.  See *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002) (applying "sliding scale" balancing test).

John Hancock has argued that a decision calling into question the enforceability of its credit default swap with Ambac would be contrary to the public interest because such transactions have become so common and because so many businesses rely upon their validity.  The point is a serious one, and it is certainly true that the public interest generally favors the enforcement of *lawful* contracts.  In the context of this transaction, however, this argument has little force.  As explained above, the record now before the court tends to show that the Merom SILO transaction was a blatantly abusive tax shelter from the beginning.  The more general points about the sanctity of contracts do not apply to this elaborate effort to defraud other taxpayers.

V.      *Bond or Other Security*

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, John Hancock argues finally that the $100,000 bond required by the state court is not adequate and that the court should order a bond of $120 million.  Because of the risks of error in preliminary injunction proceedings, the Seventh Circuit has instructed district courts to "err on the high side" in setting bond requirements for preliminary injunctions.  *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000).  In requiring a bond of $100,000, the state court appears to have relied on the fact that John Hancock already has security in the form of a mortgage and security interest that are supported by ample collateral.  This court agrees that the mortgage and security interest provide a great deal of

assurance to John Hancock.   The figure of $120 million is far higher than necessary.   At the same time, the $100,000 figure may well be too low.   One problem is that John Hancock has not suggested any meaningful basis for choosing a number anywhere in between $100,000 and $120 million.   Because of the time constraints imposed by the timing of the removal and the expiration of the state court's temporary restraining order, this court has not yet had an opportunity to explore the issue in any detail.   Following the lessons of *Mead Johnson*, the court has scheduled a hearing for tomorrow, Wednesday, November 26, 2008, at 9:00 a.m. to give John Hancock, Hoosier Energy, and all other parties the opportunity to present additional evidence regarding an appropriate bond requirement in this case.   For the next few days, however, the $100,000 bond posted in the state court will be sufficient to support the preliminary injunction.

VI.    *Discovery*

The state court had ordered expedited discovery to allow preparation for the preliminary injunction hearing.   The enforcement of that order was disrupted by the removal, and this court has not yet had an opportunity to focus on the issue. At the November 26th hearing, counsel should also be prepared to address an expedited discovery schedule and, if they seek any protective order, shall confer in advance on the terms of such an order.

*Conclusion*

For the reasons stated above, the court grants plaintiff Hoosier Energy's motion for a preliminary injunction and by separate order will continue in effect the injunctive relief already in place, pending a final judgment in this case or modification by order of this or any other court with jurisdiction.

So ordered.

Date:  November 25, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Steven M. Badger
BOSE MCKINNEY & EVANS, LLP
sbadger@boselaw.com,dbarr@boselaw.com

Gary J. Clendening
MALLOR CLENDENING GRODNER & BOHRER
gjclende@mcgb.com,rhunter@mcgb.com

Erin L. Connell
RILEY BENNETT & EGLOFF
econnell@rbelaw.com

David Roy Day
CHURCH CHURCH HITTLE & ANTRIM
day@cchalaw.com

Kathleen I. Hart
BOSE MCKINNEY & EVANS, LLP
khart@boselaw.com,rrichey@boselaw.com

Ryan L. Leitch
RILEY BENNETT & EGLOFF LLP
rleitch@rbelaw.com,lgregory@rbelaw.com

Reed S. Oslan
KIRKLAND & ELLIS
roslan@kirkland.com

George T. Patton , Jr
BOSE MCKINNEY & EVANS, LLP
gpatton@boselaw.com,lcooper@boselaw.com

John R. Schaibley , III
BAKER & DANIELS
jrschaib@bakerd.com,eawalpol@bakerd.com,wjmoore@bakerd.com

Robert K. Stanley
BAKER & DANIELS
rkstanle@bakerd.com,beth.walpole@bakerd.com

Philip A. Whistler
ICE MILLER LLP
philip.whistler@icemiller.com,marti.westerfield@icemiller.com