UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HOOSIER ENERGY RURAL ELECTRIC | ) | |
| COOPERATIVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN HANCOCK LIFE INSURANCE | ) | CASE NO. 1:08-cv-1560-DFH-DML |
| COMPANY; OP MEROM GENERATION I, | ) | |
| LLC; MEROM GENERATION I, LLC; | ) | |
| AE GLOBAL INVESTMENTS, LLC; | ) | |
| AMBAC CREDIT PRODUCTS, LLC; | ) | |
| AMBAC ASSURANCE CORPORATION and | ) | |
| COBANK, ACB, | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON INJUNCTION SECURITY ISSUES

On November 25, 2008, the court issued a preliminary injunction to block

defendant Ambac and its affiliates ("Ambac") from making a payment of

approximately $120 million to defendant John Hancock Life Insurance Company

and its affiliates ("John Hancock") pursuant to a credit default swap agreement.

See *Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Ins. Co.*,

— F. Supp. 2d —, 2008 WL 5068649 (S.D. Ind. Nov. 25, 2008).

The credit default swap between Ambac and John Hancock is an integral

part of a complex and abusive tax shelter transaction described as a "sale-in,

lease-out" or "SILO."  The SILO involves an electrical generating plant in Merom,

Indiana owned by plaintiff Hoosier Energy Rural Electric Cooperative, Inc.  Under the terms of the SILO, Hoosier Energy agreed to provide John Hancock with a credit default swap from Ambac that would protect John Hancock's interests if Hoosier Energy were to default on its obligations.  Hoosier Energy also agreed that the party providing the credit default swap (Ambac) would have at least a "AA" credit rating.  If Ambac's credit rating dropped below that level, Hoosier Energy would have sixty days to establish an equivalent form of security for John Hancock.  Failing such a replacement, John Hancock could declare a default and insist on a termination payment based on a schedule in the transaction documents.  As of October 30, 2008, the termination payment would have been $120,502,963.53.  As of November 30, 2008, the termination payment would have been $121,029,857.31.

In the Merom SILO transaction, no party has missed any required payment.  As part of the global crisis in credit markets, however, Ambac's credit rating dropped in June 2008 from AA to A, leading John Hancock eventually to declare a default and to demand the termination payment of more than $120 million from Ambac.  The court found that the planned termination payment by Ambac to John Hancock would immediately trigger a nearly mirror-image obligation on the part of Hoosier Energy that would force it into bankruptcy, causing immediate and irreparable harm.  The court also found that Hoosier Energy is reasonably likely to succeed on two legal theories.  First, the entire Merom SILO transaction is an abusive and illegal transaction, and the credit default swaps are integral parts of

that abusive and illegal transaction.  Second, and in the alternative, as a result of the disruption of international credit markets, Hoosier Energy can show temporary commercial impracticability with respect to its obligation to replace the Ambac credit default swap within the time limits imposed by the contracts.

John Hancock has argued that the security posted to protect it from damage from an improvident injunction has not been sufficient.  The state court that originally issued a temporary restraining order required Hoosier Energy to post a bond in the sum of $100,000.  It appears that the state court relied on both the Ambac credit default swap and John Hancock's second mortgage on the Merom facility to provide the bulk of the protection for John Hancock.  On November 26th, after hearing a portion of the parties' evidence on the injunction security issue, this court ordered Hoosier Energy to post a bond for $2,000,000, also relying primarily on the Ambac credit default swap itself and the second mortgage to protect John Hancock from the risks posed by the injunction, if it is ultimately determined to have been issued improvidently.  The court heard additional evidence and argument on December 2nd, and the parties submitted additional briefs after that hearing.  Based on all the evidence and arguments presented, the court takes the following actions:

First, John Hancock is entitled to a total injunction security in the sum of $132 million, which is the $120 million termination payment plus about 10 percent.  Hoosier Energy must be potentially liable to John Hancock in that sum

in the event that the preliminary injunction should not have issued.  In a worst-case scenario, John Hancock's damages might be as high as $120 or $121 million, plus some additional costs, such as transaction costs.

Second, the more difficult issue is what form this security should take. With a more complete record than was available two weeks ago, the court finds that John Hancock is adequately protected by a total of four different forms of security, plus a further restriction on Hoosier Energy's ability to take on additional debt while the preliminary injunction is in effect.  The first form of security is the existing credit default swap arrangement itself, which currently provides security in the sum of $121 million.  The second form is the $2 million cash bond posted by Hoosier Energy.  The third form is a bond by Hoosier Energy undertaking to pay John Hancock up to an additional $130 million in the event that John Hancock is damaged by improper issuance of the preliminary injunction.  The fourth form is John Hancock's existing second mortgage on Hoosier Energy's Merom facility.

*The Legal Standard*

Rule 65(c) of the Federal Rules of Civil Procedure provides that a preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  In deciding an issue of security for an injunction, the court is required to shift mental gears from forward to reverse.  After having already concluded that the moving party is reasonably likely to succeed on the merits of its case and has otherwise met the high standards for obtaining a preliminary injunction, the court must assume that its conclusions are wrong.  The court must ask what security would protect the enjoined parties from damages they would experience if it is later determined that the preliminary injunction should not have been issued.  Under federal law, the injunction security sets a ceiling on any damage award to compensate a wrongfully enjoined party, so the Seventh Circuit has instructed district courts to "err on the high side" in setting injunction security requirements.  *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000).[1]

---

[1]The Seventh Circuit explained in *Mead Johnson* that the amount of the security set by the court does not *entitle* the enjoined party to that amount in the event the injunction is vacated.  The enjoined party would still need to prove its loss.  See 201 F.3d at 888.

*Discussion*

If the court's injunction should not have been issued, then John Hancock should already have been paid $120 or $121 million in cash by Ambac.   John Hancock wants the court to require Hoosier Energy to post $121 million cash with the court or to have Ambac pay the disputed sum into the court.  Hoosier Energy argues that the first step is neither possible nor necessary.  Hoosier Eenergy argues that the second step would only delay the inevitable, very briefly, since a payment by Ambac would entitle Ambac to demand immediate payment from Hoosier Energy that would force it into the bankruptcy that the injunction is intended to prevent.

John Hancock has protection from several directions against the risk that the court has improvidently issued the preliminary injunction.  The court is satisfied that, in combination, this security protects John Hancock and will be sufficient to compensate it for its damages and expenses in the event that the preliminary injunction was improvidently granted.

I.      *The Credit Default Swap*

The most important security comes from the Ambac credit default swap itself.  Of course, this court has questioned the legality and enforceability of that instrument.  But for purposes of deciding the injunction security, the court must assume that it is wrong on that score.  The credit default swap remains in place.

Ambac's credit rating has declined from AA to A, but it remains investment grade. All information before the court indicates that Ambac remains ready, willing, and able to pay John Hancock.[2]

John Hancock argues that nothing less than a $121 million cash bond is sufficient to adequately protect its interests.  Yet, even John Hancock describes its potential damages in this situation as only the *exposure* to risk.  Dkt. 55 at 7. It has not suffered any actual damages, and although John Hancock speculates that it may be damaged if Ambac fails, it has failed to offer any substantiation of its fears that Ambac is collapsing.  Ambac's credit rating has slipped somewhat due to the economic crisis gripping the nation, a situation that has caused many financial institutions in the country to slip in their own ratings and that hopefully will prove in time to have been a temporary drop.  Even so, a slip in ratings does not, in itself, endanger John Hancock so long as Ambac is ready and able to make payment on the credit default swap, which the evidence shows it is.

Case law on this issue is sparse.  John Hancock cites *Edward G. Bashian & Sons, Inc., v. American National Bank & Trust Co*, 1997 WL 337434, at *6 (N.D. Ill.

---

[2]John Hancock and Ambac have reported to the court that Ambac's board recently voted to suspend its dividend.  John Hancock has also reminded the court that only days before their collapses, both Bear Stearns and Lehman Brothers were making optimistic public statements about their solvency.  As John Hancock has put it, the first warning of trouble may be the "sound of the body hitting the floor."  Dkt. 87 at 7-8.  Ambac has strongly objected to these colorful attacks on its financial condition, pointing to public analyses confirming that it has sufficient ability to pay claims and adequate liquidity levels.  Dkt. 89 at 4-6.

June 16, 1997), for the principle that the court should impose security that is equal to the security that John Hancock bargained for. Dkt. 55 at 1, 7-8. The *Edward G. Bashian & Sons* decision is instructive and recognizes that a separate injunction bond is not necessarily required in every case if the enjoined party is protected through other means. 1997 WL 337434, at *6 (although Rule 65(c) requires that "security" be posted, the rule does not indicate that an injunction bond is the only security that may be given; defendant was adequately protected by letters of credit so that a separate injunction bond was not required). John Hancock is entitled to the security that it bargained for, and it bargained for the Ambac credit default swap. So long as Ambac remains solvent and able to pay on the credit default swap, the credit default swap itself provides substantial security to John Hancock because it is worth $121 million. It is not necessary to require Hoosier Energy to post an additional $121 million in cash.

On this point, the court in *Edward G. Bashian & Sons* drew support from *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794 (7th Cir. 1986), which provides even more pointed guidance for this court in this case. *Olympia Equipment* dealt not with a Rule 65(c) bond but with a supersedeas appeal bond under Rule 62(d). The district court had entered a judgment of $36 million against Western Union in an antitrust case. Western Union was financially distressed and illiquid. It could not have posted the required amount in the form of a bond. The district court allowed Western Union to post a Rule 62(d) appeal bond consisting of $10 million in cash, $10 million in accounts

receivable, and a security interest that Western Union estimated to be worth about $70 million dollars.  786 F.2d at 795.  Olympia Equipment appealed that order, contending that a supersedeas bond was mandatory and that the district court's "alternate security" provided inadequate protection.  *Id.* at 796.

The Seventh Circuit affirmed.  The Seventh Circuit found that Rule 62(d)'s requirement of a supersedeas bond was not "ironclad," particularly in instances where the requirement would put the defendant's other creditors in undue jeopardy.  *Id.* at 796-97.  The court found that the district court's "alternate security" was adequate, with a minor modification.[3]  In such a case, the district court must balance the interest of a judgment creditor against other creditors of the defendant who might be harmed if the defendant were forced to forego an appeal, or at least to tolerate immediate execution of the judgment, which in Western Union's case would have led to immediate bankruptcy.  The Seventh Circuit wrote:  "we are reluctant to conclude that a district judge commits an abuse of discretion by refusing to allow a plaintiff to execute a judgment in circumstances where the execution may cause a billion-dollar bankruptcy, merely because the alternative security to a supersedeas bond that the defendant apparently cannot post provides a slightly inferior protection of the plaintiff's

---

[3]The district court judge had allowed Western Union to make cash transfers to its parent company, even though the parent would probably not be liable on the judgment.  *Id.* at 798.  The Seventh Circuit required that the district court's order be modified to forbid Western Union from making any cash transfers to its parent without the parent's assent to be bound on the judgment to the extent of the transfer.  *Id.* at 799.

interest." *Olympia Equipment*, 786 F.2d at 799.  The court added:  "Of course other creditors' claims may be contingent too; nevertheless it would be a painful irony for us to impair and perhaps even destroy the other creditors' claims merely to remove every element of hazard from a claim that may not survive the process of appeal."  *Id.* at 798.[4]

Similar logic applies here.  The court recognizes that the package of security that the court is requiring is not as good for John Hancock as cash in hand, and it is not quite as good as even a credit default swap agreement with a party rated AA.  Similarly, the combination of security required in *Olympia Equipment* was not as good for the plaintiff in that case as a standard supersedeas bond, but the minor differences did not lead the court to reject the security package ordered by the district court.  And similarly here, the package the court is requiring will provide substantial security for John Hancock.  The alternative demanded by John Hancock would force the imminent bankruptcy of Hoosier Energy, causing irreparable harm to Hoosier Energy.  This harm would result despite the fact that Hoosier Energy has already convinced this court that it is reasonably likely to prevail on the merits of its claims.  In that respect, Hoosier Energy's position is substantially stronger than Western Union's, which had already lost in the district court but was still entitled to appeal that judgment.  The Seventh Circuit's

---

[4]When the Seventh Circuit addressed the merits of the appeal, it reversed the judgment that would have, absent the flexibility about the bond requirement, forced Western Union into bankruptcy. *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986).

decision in *Olympia Equipment* recognized the high stakes and the risks of error in either direction, and the appellate court allowed the district court to find an equitable and reasonable (if somewhat imprecise) balance among the competing factors.  See 786 F.2d at 799.  That is what the court has tried to do in this case.

II.      *The Cash Bond and Additional Bond from Hoosier Energy*

Although the credit default swap itself secures John Hancock's interests so long as Ambac remains solvent and ready, willing, and able to pay, the court must take care to "err on the high side."  *Mead Johnson & Co.*, 201 F.3d at 888.  With that directive, the court requires Hoosier Energy to post security with a total value of $132 million dollars, as described above.  It is possible that John Hancock could incur other damages or costs such as transaction expenses from the preliminary injunction.  Pursuant to Rule 65(c), John Hancock is entitled to protection against those additional potential damages and costs.  The nine or ten percent allowance, above and beyond the value of the $120 or $121 million credit default swap, is deliberately "on the high side" and should be sufficient to meet those needs.  See *Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1100 (N.D. Ind. 1998) (requiring injunction bond of $150,000 where obligation of $140,000 was in dispute).  And, as in *Olympia Equipment*, 786 F.2d at 799, John Hancock is free at any time to ask the court to modify the security requirements in light of changed circumstances.

This reasoning leads to the second and third forms of security.  The court has already required, and Hoosier Energy has already posted, a cash bond of $2 million.  The court is also requiring Hoosier Energy to post its own undertaking to pay John Hancock up to an additional $130 million in damages it might suffer from an improper injunction.  John Hancock will not be impressed by such a promise from a company that says honoring the promise would force it into bankruptcy.  The total amount of $132 million is still important, however, for two reasons.  First, it recognizes, more explicitly than have this court's prior discussions of the issue, that in a worst-case scenario, John Hancock does face risks of that magnitude, if the injunction were to be found improper and if Ambac were to fail to honor its credit default swap agreement.  Second, in a worst-case scenario in which Hoosier Energy would go into bankruptcy, the full amount recognizes that John Hancock would have a claim (though not a first priority claim) on all of Hoosier Energy's assets to recover its damages.

III.    *The Subordinated Mortgage*

Most of the parties' and the court's time and attention to the security issue has focused on a fourth form of security available to protect John Hancock's interest.   As part of the Merom SILO transaction, John Hancock received a mortgage interest in the Merom assets, set forth in the Subordinated Mortgage and Security Agreement dates as of December 1, 2002.   The mortgage secures Hoosier Energy's performance of obligations in the SILO transaction.   Hoosier Energy has argued that the John Hancock mortgage provides additional security, beyond the Ambac credit default swap and the cash bond, against the risk of an improvident injunction.   Although the mortgage may present the most complex issues, it is important, before diving into them, to remember that it is only one part of the entire package of required security for the injunction; it does not stand as the sole security.

John Hancock has argued that its mortgage interest has relatively little value because it is "subordinated, dilutable, shared, and contingent."   The John Hancock mortgage is all of those things.   The mortgage is subordinated to a senior mortgage held by a federal agency (the Rural Utility Service or RUS), which has provided the bulk of financing for Hoosier Energy's electrical generation and distribution system.    The mortgage is dilutable because the terms of the instruments allow Hoosier Energy to add additional debt to the RUS that is senior to John Hancock's interest.   The mortgage is shared because John Hancock

stands "*pari passu*" or "shoulder to shoulder" with two other creditors with legally equivalent interests.   (John Hancock's interest is a majority of the collective subordinated obligation.) The mortgage is also contingent in that John Hancock would need the consent of other creditors, including the RUS and the other mortgagees, to exercise its rights as a subordinated mortgagee.

These features of the John Hancock mortgage mean it is not readily equivalent to cash, and neither party has offered evidence showing the fair market value of the John Hancock mortgage interest.  It is obviously worth something, but it is worth substantially less than $120 million.  That much is clear from the testimony of each party's expert witness, Patrick Conroy for John Hancock and Louis Dudney for Hoosier Energy.  Despite that uncertainty, however, Hoosier Energy has relied upon the existence of the mortgage to show that John Hancock does not need an additional injunction bond so substantial that Hoosier Energy could not possibly provide it.

The first step in the valuation equation is to estimate the value of the Merom generating plant as a whole.  Hoosier Energy's expert witness Louis Dudney did not offer an opinion as to its fair market value; instead, he identified three "indications of value."  The first indication of value was the appraisal done by Deloitte Touche as of December 19, 2002 for John Hancock.  The Deloitte appraisal placed the fair market value at $900 million at that time, when the facility was approximately 20 years old.  Since then, Hoosier Energy has invested

approximately $140 million in capital improvements in the facility and has maintained the facility and continued to operate it.

For the second indication of value, Dudney compared the ratios of book value of invested capital to market value of invested capital for eleven publicly-traded private electric utilities.  He calculated an average multiplier of 1.1, so that market value would be 1.1 times book value.  Applying that same ratio to Hoosier Energy's book value of invested capital in the Merom plant, Dudney calculated a market value of $1.16 billion.

For the third indication of value, Dudney tried to calculate replacement cost for the Merom plant using a standard industry guide to power plant costs.  His calculation as of August 2008 was $1.6 billion.

Each of these numbers poses substantial problems, and Dudney quite pointedly did not try to assert any opinion as to a "true" fair market value at this time.  (The Deloitte appraisal's estimate of fair market value is reflected by about 300 pages of text and several months of work.)  Dudney did not perform any analysis based on projected cash flows from the asset, which might have provided the best indication of value.

The Deloitte appraisal of $900 million was done in December 2002.  There is ample reason to think that the passage of time, including dramatic changes in

financial markets over the past several months, has affected the value.  Regulatory and legal environments have changed since 2002, as have relative costs of coal and other inputs for Hoosier Energy, which has relatively limited ability to raise the prices it charges for electricity.  Complicating matters further, Dudney's calculation using the Deloitte appraisal combined that number with Hoosier Energy's net book values for all of its assets other than the Merom plant, producing an uncomfortable blend of apples and oranges in the overall calculation.

Dudney's estimate of the relationship between net book value of invested capital and the market value of invested capital for eleven publicly traded companies also has limits.  First, of course, Hoosier Energy is a cooperative that does not try to make profits for itself.  Dudney's comparators are all large, publicly traded, for-profit companies.  Second, Dudney based his calculation on stock prices as of November 26, 2008.  Recent sharp fluctuations in stock prices show that this calculation is subject to fairly dramatic swings depending on the particular day used.

For its part, John Hancock offered the valuations of the Merom real and personal property that are part of the state and county property tax records.  Those numbers are much smaller – $113 million for the personal property and $195,000 for the real property.  The court places little weight on the property tax numbers because the complexities of the Indiana property tax system undermine

reliance upon them as fair market value.  The idea that a willing seller would sell a facility producing 1,000 megawatts of power for as little as $113 million is beyond anything the court might credit.  John Hancock has not offered any other opinion as to value or even "indications of value," but has relied on Conroy's testimony about the difficulty of assessing value.

The second step of the value equation is to determine the value of more senior claims against the Merom assets.  Dudney calculated those claims as approximately $550 million at this time.  John Hancock has not undermined that calculation, but Hoosier Energy and the RUS have the power to agree to raise that number.

The third step in the value equation is to calculate the current value of John Hancock's claim plus the claims of other equally senior second mortgage holders. Dudney calculated these total claims as $182 million (including $121 million for John Hancock) in the event of a termination of the Merom SILO transaction. During the cross-examination of Dudney, John Hancock argued that the $182 million amount was far too low because it did not include the termination values of the debt portions of the Merom SILO financing.  That attack is not persuasive. The attack does not take into account the money that the Ambac entities and CoBank are already holding to pay off those debt obligations.  Those fully-funded accounts to pay off the debt obligations are critical parts of the circular movement of money that undermines the legitimacy of the Merom SILO transaction.  See

Dkt. No. 11–4, at page 51 of 86 (Plaintiff's Compendium Ex.) (diagram of money flows in the transaction).  Because the debt obligations would be paid from those fully-funded accounts, they do not need to be taken into account in valuing the claims of the "shoulder-to-shoulder" second mortgage holders.

Using each of his three "indications of value," Dudney calculated that John Hancock and the other subordinated mortgage holders have substantial excess collateral available to them.  For the Deloitte appraisal, Dudney calculated that collateral worth $479 million secures the obligations of $182 million.  For the book/market value calculation, he estimated that collateral worth $270 million secures the obligations of $182 million.  For the replacement cost method, he estimated that collateral worth $1.15 billion secures the obligations of $182 million.

Notwithstanding all of the problems with Dudney's "indications of value," and without trying to place a specific value on the mortgage, the court finds that the John Hancock mortgage has sufficient value so that, when combined with the Ambac credit default swap, the $130 million bond from Hoosier Energy, and the $2 million cash bond, it currently provides sufficient security to protect John Hancock from damage it might suffer if it turns out that the injunction should not have been issued.

Further complicating matters is the fact that in April 2008, before the Merom problems developed, Hoosier Energy committed to purchase for $195 million a 50 percent interest in an additional power generating facility. The deal, known as the Tenaska transaction is scheduled to close in early January 2009. Hoosier Energy plans to borrow all of the purchase price. Hoosier Energy's senior vice president Thomas Bernardi testified that Hoosier Energy has arranged for an unsecured loan from the CFC[5] for up to one year, and that loan will be replaced by an additional secured loan from the Rural Utility Service. The plan is that the RUS loan would be secured by the existing senior mortgage on all or nearly all of Hoosier Energy's assets, including the new Tenaska facility and the Merom facility. The debt to the RUS would be secured with mortgages that would include adding approximately another $200 million in debt secured by the Merom plant (and all other Hoosier Energy assets) that would be senior to the John Hancock mortgage.

John Hancock is understandably troubled by this prospect, as is the court, especially since Hoosier Energy keeps assuring John Hancock and the court that the second mortgage provides such good protection. As tempting as it might be to simply block the Tenaska transaction as a condition of the preliminary injunction, such action by the court would probably trigger a $25 million "break-up fee" that Hoosier Energy would owe to the prospective seller. Needing to pay

---

[5]The court understands Bernardi's reference to be to the National Rural Utilities Cooperative Finance Corporation.

that fee in cash would also have dramatic and probably devastating effects on Hoosier Energy's finances, comparable to the harm the injunction is intended to avoid.  At the same time, John Hancock is a party subject to a preliminary injunction.  Hoosier Energy is relying on the subordinated mortgage to provide security for the injunction, and John Hancock is entitled not to have Hoosier Energy take steps that would substantially impair the value of that mortgage for that purpose.

If Hoosier Energy closes on the Tenaska transaction, then within the next year or so, it will add approximately $200 million in additional debt senior to John Hancock's subordinated mortgage on the Merom facility.  At the same time, Hoosier Energy will also be adding assets of approximately the same value. Accordingly, the court does not intend to interfere with the planned Tenaska transaction, which will not undermine the package of injunction security ordered by the court.  At the same time, the court will require Hoosier Energy to give the court and other parties at least 60 days prior notice before closing on the secured loan with the RUS.

There is yet another complication.  Hoosier Energy has argued that it should have even more flexibility in its financing.  The issue again involves Hoosier Energy's and the RUS's ability to add debt secured by mortgages senior to the John Hancock mortgage on the Merom facility.  Hoosier Energy proposes that the court order it not to increase the principal amount of that debt secured by the

government's first-priority lien by more than $50 million over the next six months, without permission from the court.  Bernardi testified that he expects Hoosier Energy to borrow approximately another $100 million from the RUS over the next year to finance capital improvements and other routine expenses.  John Hancock understandably finds this provision unacceptable, as does the court.

As the discussion above shows, it is very difficult to put a firm value on John Hancock's mortgage interest, even as of today.  The Tenaska transaction will add an asset with a known value equivalent to the additional debt.  Without much more information about how any additional debt might be used, the court is not confident that a further dilution of John Hancock's mortgage interest by as much as $50 million would not undermine the security that the court has deemed sufficient for now.  The court will allow Hoosier Energy to add up to $5 million to the total net indebtedness secured by the Consolidated Mortgage, but anything beyond that level would require prior order of this court, after notice and an opportunity for John Hancock and other interested parties to be heard.

IV.   *Other Arguments*

John Hancock has also raised some additional arguments based on 31 U.S.C. § 9304 and this court's Attorney's Handbook.  Section 9304 provides:

> (a) When a law of the United States Government requires or permits a person to give a surety bond through a surety, the person satisfies the law if the surety bond is provided for the person by a corporation –

> (1) incorporated under the laws of –
>    (A) the United States; or
>    (B) a State, the District of Columbia, or a territory or possession of the United States;
> (2) that may under those laws guarantee –
>    (A) the fidelity of persons holding positions of trust; and
>    (B) bonds and undertakings in judicial proceedings; and
> (3) complying with sections 9305 and 9306 of this title.
>
> (b) Each surety bond shall be approved by the official of the Government required to approve or accept the bond.  The official may not require that the surety bond be given through a guaranty corporation or through any particular guaranty corporation.

31 U.S.C. § 9304.  John Hancock points out that neither the Ambac credit default swap, the subordinated mortgage, nor the unsecured bond from Hoosier Energy meets these requirements.

The court does not read section 9304 as imposing minimum requirements on all surety bonds.  It provides instead a safe harbor:  a surety bond from a person who meets those statutory standards will be sufficient.  Section 9304 does not say that nothing else will do.  The statute reads that "the person satisfies the law if . . . ," but not it does not say the person satisfies the law "only if. . . ."  When a party seeking an injunction can meet those requirements, the issue of security is much simpler than it is in this case.  But the statute does not prohibit the court from tailoring a more complex solution for a particular case.[6]

------

[6]Section 9304(b) and the procedures established in 31 U.S.C. § 9305 also help to prevent favoritism and protect fair competition for surety businesses.

John Hancock also relies on this court's Attorney Handbook, available among "Forms and Publications" on the court's website, www.insd.uscourts.gov. The court publishes that handbook to assist attorneys and parties in dealing with administrative requirements of the court and the clerk's office. The handbook does not and could not have the force of law. The section on "Security for Costs" states in relevant part:

> Except as otherwise provided by law, every bond or undertaking must (1) be secured by the deposit of cash or negotiable securities issued by the United States of America in the amount of the bond or undertaking, (2) be secured by the undertaking or guaranty of a corporate surety holding a certificate of authority from the Secretary of the Treasury or (3) be secured by the undertaking or guaranty of two individuals, residents of Indiana, each of whom owns real property within such district worth double the amount of the bond or undertaking over all his/her debts and liabilities and over all obligations assumed by him/her on other bonds or undertakings and exclusive of all legal exceptions. A husband and wife may act as sureties on a bond, but they are considered as only one surety on jointly owned property.

Attorney's Handbook 40. The handbook uses the word "must" to describe the standards that must be met, but again, it does not have the force of law and cannot preclude a court from exercising its equitable power to fashion a security package sufficient to meet the needs of a particular case. The handbook certainly describes approaches that are simplest and sure to be successful, but it does not and could not prescribe the exclusive mechanisms for meeting such requirements.

Finally, in its post-hearing submission, John Hancock has suggested that the best way to satisfy the security requirement here would be to require Ambac

to pay the $121 million termination payment into the court, which could hold the funds pending a final decision in the case.   Ambac has objected on several grounds.   First, Ambac argues that Rule 65(c) does not authorize a court to order one enjoined party to post the moving party's security for the benefit of another enjoined party.   Second, Ambac argues that the credit default swap is not a bond and therefore could not satisfy Rule 65(c).   Ambac also hotly disputes John Hancock's description of Ambac's financial situation as "tottering" and the like.

The court agrees with Ambac that Rule 65(c) does not authorize the court to order an enjoined party (or any person other than the moving party) to give the security required under Rule 65(c):   "The court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper. . . ."   The court does not reach Ambac's second argument, at least for these purposes.   In the entry granting a preliminary injunction, the court observed that the credit default swap is not a bond.   *Hoosier Energy*, — F. Supp. 2d at — n.2, 2008 WL 5068649, at *8 n.2.   For purposes of deciding injunction security, however, the court must assume it was incorrect in its analysis of the merits, so the court is reluctant to rely on its prior reasoning for these purposes.[7]   At the same time, the court stands by its weighing of the

---

[7]John Hancock's suggestion, when arguing that the existence of the Ambac credit default swap is not sufficient security, that footnote 2 represents the "law of the case" is similarly mistaken.   As John Hancock has pointed out correctly that the court, when deciding about injunction security, must assume it was wrong to issue the injunction.   If the court's discussion of the merits in the entry were the law of the case, the court would impose only a minimal bond.   That is not

(continued...)

equities in the entry, and in particular the concern that the result would be inequitable if John Hancock were able to terminate the transaction and walk away with the improper tax benefits it sought, while leaving Ambac and Hoosier Energy behind to pick up the pieces of this abusive transaction.  *Id.* at —, 2008 WL 5068649, at *13.

Accordingly, the court orders as follows, as conditions for keeping the preliminary injunction in effect:

1.      Plaintiff Hoosier Energy shall maintain in effect the cash bond of $2 million, which it posted on December 1, 2008.

2.      Plaintiff Hoosier Energy shall file with the court **no later than Monday, December 15, 2008**, its own bond undertaking to pay the John Hancock defendants up to $130 million for costs and damages sustained by the John Hancock defendants if they are found to have been wrongfully enjoined.

3.      The credit default swaps among the John Hancock defendants, the Ambac defendants, and plaintiff Hoosier Energy shall remain in place.

---

[7](...continued)
how the law works in a case like this.

4.      John Hancock's existing subordinated mortgage on the Merom generating facility shall remain in place.

5.      Plaintiff Hoosier Energy may close the Tenaska transaction as planned, but shall not otherwise increase by more than $5 million the total net indebtedness secured by the RUS mortgage as of December 10, 2008.   Any increase beyond that amount would require prior order of this court, after notice and an opportunity for John Hancock and other interested parties to be heard.

This order supersedes prior orders regarding injunction security, including the court's order of November 26, 2008.  The court retains jurisdiction to modify these requirements as appropriate.  See Fed. R. Civ. P. 62(c).

So ordered.

Date:  December 11, 2008

*David F. Hamilton*
_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Steven M. Badger
BOSE MCKINNEY & EVANS, LLP
sbadger@boselaw.com,dbarr@boselaw.com

Gary J. Clendening
MALLOR CLENDENING GRODNER & BOHRER
gjclende@mcgb.com,rhunter@mcgb.com

Erin L. Connell
RILEY BENNETT & EGLOFF
econnell@rbelaw.com

David Roy Day
CHURCH CHURCH HITTLE & ANTRIM
day@cchalaw.com

Kathleen I. Hart
BOSE MCKINNEY & EVANS, LLP
khart@boselaw.com,rrichey@boselaw.com

Ryan L. Leitch
RILEY BENNETT & EGLOFF LLP
rleitch@rbelaw.com,lgregory@rbelaw.com

Reed S. Oslan
KIRKLAND & ELLIS
roslan@kirkland.com

George T. Patton, Jr.
BOSE MCKINNEY & EVANS, LLP
gpatton@boselaw.com,lcooper@boselaw.com

John R. Schaibley, III
BAKER & DANIELS
jrschaib@bakerd.com,eawalpol@bakerd.com,wjmoore@bakerd.com

Robert K. Stanley

BAKER & DANIELS
rkstanle@bakerd.com,beth.walpole@bakerd.com

Michael Baratz
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave. N.W.
Washington, DC 20036

Israel Dahan
CADWALADER WICKERSHAM & TAFT LLC
One World Financial Center
New York, NY 10281

Matthew J. Herrington
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave., N.W.
Washington, DC 20036

Jonathan M. Hoff
CADWALADER WICKERSHAM & TAFT LLC
One World Financial Center
New York, NY 10281

Benjamin W. Hulse
KIRKLAND & ELLIS, LLP
200 E. Randolph Dr.
Chicago, IL 60601

James C. Joslin
KIRKLAND & ELLIS, LLP
200 E. Randolph Dr.
Chicago, IL 60601

Steven Lenkowsky
CADWALADER WICKERSHAM & TAFT LLC
One World Financial Center
New York, NY 10281